**No. 26-1652**

# United States Court of Appeals for the Ninth Circuit

DYWANNA DRUMMER; ANTHONY D'ANTONIO; SCHALISE LEE; CYNTHIA RUBIO; and MARY LEE WALLACE, Individually and on Behalf of All Others Similarly Situated,

*Plaintiffs-Appellees*,

v.

COSTAR GROUP, INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Central District of California
No. 5:25-cv-01047-JGB-SP (Hon. Jesus G. Bernal)

## OPENING BRIEF FOR DEFENDANT-APPELLANT COSTAR GROUP, INC.


Alexander C.K. Wyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 400
Los Angeles, CA 90071
(213) 485-1234

Roman Martinez
Nicholas J. Boyle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Michael H. Rubin
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 395-0600
michael.rubin@lw.com

*Counsel for Defendant-Appellant CoStar Group, Inc.*

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... iii

STATEMENT REGARDING ORAL ARGUMENT ..... xi

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 4

STATEMENT OF THE ISSUES ..... 5

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ..... 5

STATEMENT OF THE CASE ..... 5

A. CIPA Statutory Background ..... 5

B. Factual Background ..... 7

C. Proceedings Below ..... 10

SUMMARY OF ARGUMENT ..... 14

STANDARD OF REVIEW ..... 17

ARGUMENT ..... 17

I. PLAINTIFFS LACK ARTICLE III STANDING ..... 17

A. Plaintiffs' Privacy-Based Theory Of Standing Fails ..... 18

1. Article III Requires A Concrete Injury With A Close Relationship To Harms Traditionally Cognizable At Common Law ..... 18

2. The Alleged Collection And Transmission Of Plaintiffs' IP Addresses Does Not Establish A Cognizable Privacy-Based Harm ..... 22

3. The District Court's Contrary Holding Is Meritless ..... 29

B. Plaintiffs' Alternative "Economic Harm" Theory Fails ..... 34

**Page**

II. PLAINTIFFS FAIL TO STATE A VIABLE CLAIM UNDER CIPA'S PEN REGISTER PROVISION ....................................................36

A. Software That Collects Website Visitors' IP Addresses Is Not A "Pen Register" ....................................................36

1. Pen Registers Record Information About Where A User's Communication Is Going, Not Source Information Like The User's Own IP Address ....................................................37

2. Pen Registers Record Telephone Data, Not Online Data Like Plaintiffs' IP Addresses ....................................................49

B. The District Court's Expansive Interpretation Of Section 638.51 To Reach Website Users' IP Addresses Lacks Merit ..........................53

CONCLUSION ....................................................57

STATEMENT OF RELATED CASES ....................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abuelhawa v. United States*,
556 U.S. 816 (2009)....................................................................53

*Ardon v. City of Los Angeles*,
366 P.3d 996 (Cal. 2016)..............................................................37

*Aviles v. LiveRamp, Inc.*,
No. 24STCV19869, 2025 WL 487196 (Cal. Super. Ct. Jan. 28, 2025)..................................................................46

*Baysal v. Midvale Indemnity Co.*,
78 F.4th 976 (7th Cir. 2023)..........................................................23

*Bond v. United States*,
572 U.S. 844 (2014)..........................................38, 39, 41, 53, 54

*Bradshaw v. Lowe's Cos.*,
No. 25-cv-0742, 2025 WL 3171740 (S.D. Cal. Nov. 12, 2025)..................13, 25

*Busker v. Wabtec Corp.*,
492 P.3d 963 (Cal. 2021)..............................................................53

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. 2017)....................................................34

*California v. Texas*,
593 U.S. 659 (2021)...............................................................17, 25

*Capitol Records Inc. v. Thomas-Rasset*,
No. 06-cv-1497, 2009 WL 1664468 (D. Minn. June 11, 2009)..........................48

*Casillas v. Transitions Optical, Inc.*,
No. 23STCV30742, 2024 WL 4873370 (Cal. Super. Ct. Sept. 9, 2024)..................................................................52

*City of Los Angeles v. PricewaterhouseCoopers, LLP*,
553 P.3d 1194 (Cal. 2024)............................................................47

*Cook v. GameStop, Inc.*,
148 F.4th 153 (3d Cir. 2025).................................................*passim*

**Page(s)**

*Dawidzik v. Tesla, Inc.*,
No. 25-cv-01982, 2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) ....................13

*Estrella v. Brandt*,
682 F.2d 814 (9th Cir. 1982) ....................47

*In re Facebook, Inc., Consumer Privacy User Profile Litigation*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ....................35

*Facebook, Inc. v. K.G.S.*,
294 So. 3d 122 (Ala. 2019) ....................32

*Flanagan v. Flanagan*,
41 P.3d 575 (Cal. 2002) ....................5

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) ....................55

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
806 F.3d 125 (3d Cir. 2015) ....................9, 10, 47

*Graf v. Zynga Game Network, Inc. (In re Zynga Privacy Litigation)*,
750 F.3d 1098 (9th Cir. 2014) ....................40

*Grizzly General Contractors Corp. v. Kitsap Public Health District*,
No. 25-2183, 2026 WL 753173 (9th Cir. Mar. 17, 2026) ....................34

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ....................17

*Harcott v. County of Kings*,
25 P.3d 649 (Cal. 2001) ....................49

*Hohenshelt v. Superior Court*,
573 P.3d 944 (Cal. 2025) ....................51

*Holmes v. Elephant Insurance Co.*,
156 F.4th 413 (4th Cir. 2025) ....................26

*Hunstein v. Preferred Collection & Management Services, Inc.*,
48 F.4th 1236 (11th Cir. 2022) ....................26

**Page(s)**

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ....................................................35

*Johnson v. United States*,
559 U.S. 133 (2010)..............................................................................39

*Keskinen v. Lush Handmade Cosmetics LLC*,
770 F. Supp. 3d 1234 (C.D. Cal. 2025) ...............................................29, 30

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025)........................................13, 30, 32

*Kishnani v. Royal Caribbean Cruises Ltd.*,
No. 25-cv-01473, 2025 WL 1745726 (N.D. Cal. June 24, 2025) ......................13

*Kleffman v. Vonage Holdings Corp.*,
232 P.3d 625 (Cal. 2010) .......................................................................24

*Levings v. Open Text Corp.*,
No. 24STCV05440, 2024 WL 5672082 (Cal. Super. Ct. Sept. 3,
2024) ...................................................................................................52

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..............................................................................30

*Martin v. LCMC Health Holdings, Inc.*,
101 F.4th 410 (5th Cir. 2024) ...................................................................9

*McShannock v. JP Morgan Chase Bank NA*,
976 F.3d 881 (9th Cir. 2020) .................................................................17

*Medical Laboratory Management Consultants v. American Broadcasting Cos.*,
306 F.3d 806 (9th Cir. 2002) .................................................................28

*Mendoza v. Fonseca McElroy Grinding Co.*,
492 P.3d 993 (Cal. 2021) .......................................................................48

*Mirmalek v. Los Angeles Times Communications LLC*,
No. 24-cv-01797, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ................29, 30

*Mitchener v. CuriosityStream, Inc.*,
815 F. Supp. 3d 845 (N.D. Cal. 2025).....................................................13

**Page(s)**

*New York Trust Co. v. Commissioner*,
68 F.2d 19 (2d Cir. 1933), *aff'd*, 292 U.S. 455 (1934) ....................................54

*Nabozny v. Optio Solutions LLC*,
84 F.4th 731 (7th Cir. 2023) ....................................................................26

*National Cable & Telecommunications Association v. Brand X Internet Services*,
545 U.S. 967 (2005)..................................................................................8, 48

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ....................................................................9, 10

*Palacios v. Fandom, Inc.*,
No. 24STCV11264, 2024 WL 5494527 (Cal. Super. Ct. Sept. 24, 2024) .....................................................................................................46

*People v. Blair*,
602 P.2d 738 (Cal. 1979) ..........................................................................40

*People v. Scott*,
324 P.3d 827 (Cal. 2014) ..........................................................................51

*Phillips v. U.S. Customs & Border Protection*,
74 F.4th 986 (9th Cir. 2023) ................................................................19, 28

*Pinkert v. Schwab Charitable Fund*,
48 F.4th 1051 (9th Cir. 2022) ....................................................................17

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .............................................................*passim*

*Rodriguez v. Culligan International Co.*,
No. 25-cv-00225, 2025 WL 3064113 (S.D. Cal. Nov. 3, 2025) ........................13

*Rodriguez v. Ink America International Group LLC*,
No. 25STCV15350, 2025 WL 4034985 (Cal. Super. Ct. Dec. 10, 2025) .....................................................................................................52

*Rodriguez v. Plivo Inc.*,
No. 24STCV08972, 2024 WL 5184413 (Cal. Super. Ct. Oct. 2, 2024) .....................................................................................................46

**Page(s)**

*Sackett v. EPA*,
598 U.S. 651 (2023)....................................................................................39

*Sanchez v. Cars.com Inc.*,
No. 24STCV13201, 2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) ....................................................................................52

*Schallert v. Palo Alto Networks, Inc.*,
No. 25STCV17109, 2026 WL 754028 (Cal. Super. Ct. Mar. 6, 2026) ....................................................................................52

*Scharon v. Paramount Global*,
No. 25STCV10585, 2025 WL 2996812 (Cal. Super. Ct. Oct. 3, 2025) ....................................................................................52

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024)..........................................................29, 30

*Shields v. Professional Bureau of Collections of Maryland, Inc.*,
55 F.4th 823 (10th Cir. 2022) ..............................................................................26

*Sipple v. Chronicle Publishing Co.*,
201 Cal. Rptr. 665 (Ct. App. 1984) .....................................................................32

*Smith v. Maryland*,
442 U.S. 735 (1979)..........................................................................6, 40, 50

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).............................................................................19, 34

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998)....................................................................................30

*Sturgeon v. Frost*,
577 U.S. 424 (2016)....................................................................................53

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................................*passim*

*United States v. Carneiro*,
861 F.2d 1171 (9th Cir. 1988) ..............................................................................6

**Page(s)**

*United States v. Corrales-Vazquez*,
931 F.3d 944 (9th Cir. 2019) ....................................................................53

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ..........................................................8, 23, 24, 41, 48

*United States v. Miller*,
425 U.S. 435 (1976)....................................................................................33

*United States v. New York Telephone Co.*,
434 U.S. 159 (1977)....................................................................................40

*United States v. Rosenow*,
50 F.4th 715 (9th Cir. 2022) ..........................................................3, 8, 23, 24, 33

*United States v. Stevens*,
559 U.S. 460 (2010)....................................................................................38

*United States v. Taketa*,
923 F.2d 665 (9th Cir. 1991) ....................................................................40

*Van Buren v. United States*,
593 U.S. 374 (2021)....................................................................................49

*Wakefield v. ViSalus, Inc.*,
51 F.4th 1109 (9th Cir. 2022) ....................................................................28

*Winsor v. Sequoia Benefits & Insurance Services, LLC*,
62 F.4th 517 (9th Cir. 2023) ......................................................................34

*Wooten v. BioLife Plasma Services L.P.*,
807 F. Supp. 3d 1139 (E.D. Cal. 2025) ......................................................13

*Xu v. Reuters News & Media Inc.*,
No. 24-cv-2466, 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025)...............13, 24, 32

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996)....................................................................................36

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) ..............................................37, 39, 41, 48, 54

**Page(s)**

## STATUTES

18 U.S.C. § 3121 ....................................................................................6

18 U.S.C. § 3125(a) ................................................................................6

18 U.S.C. § 3127 ....................................................................................6

28 U.S.C. § 1292(b) ................................................................................4

28 U.S.C. § 1332(d) ................................................................................4

Cal. Civ. Code § 1798.140(v)(1)(A) ..........................................................51

Cal. Civ. Code § 1798.140(v)(1)(F) ..........................................................51

Cal. Penal Code § 630 ..............................................................................5

Cal. Penal Code § 637.2(a) .......................................................................7

Cal. Penal Code § 637.2(c) .......................................................................7

Cal. Penal Code § 638.50(b) ..............................................................*passim*

Cal. Penal Code § 638.50(c) .....................................................................43

Cal. Penal Code § 638.51 ........................................................................10

Cal. Penal Code § 638.51(a) ..................................................6, 10, 36, 42, 51

Cal. Penal Code § 638.51(b) ....................................................................10

Cal. Penal Code § 638.51(b)(5) .............................................................7, 55

Cal. Penal Code § 638.51(c) .....................................................................7

Cal. Penal Code § 638.52(d)(1) ........................................................7, 42, 50

Cal. Penal Code § 638.52(d)(3) ........................................................7, 42, 50

Cal. Penal Code § 638.53(a) .....................................................................7

Cal. Penal Code § 638.53(b) .....................................................................7

## OTHER AUTHORITIES

86 Ops. Cal. Atty. Gen. 198 (2003) ..........................................................45

**Page(s)**

*About TikTok Pixel*, TikTok Business Help Center (last updated Mar. 2025), https://ads.tiktok.com/help/article/tiktok-pixel ........................................9

*American Heritage Dictionary of the English Language* (5th ed. 2011) ................38

Assem. Comm. on Appropriations, Analysis of Assem. Bill No. 929 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 28, 2015) ...............................................45

Assem. Comm. on Privacy & Consumer Protection, Analysis of Assem. Bill No. 929 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 17, 2015) .....................................................................................................44, 50

Assem. Comm. on Public Safety, Analysis of Assem. Bill No. 929 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 6, 2015) .................................................45

Assem. Floor Analysis, Analysis of Assem. Bill No. 929 (Cal. Leg., 2015-16 Reg. Sess.) (July 8, 2015)...................................................................45

*Cookie Policy*, CoStar (last updated July 15, 2025), https://www.costar.com/about/cookie-policy ....................................................9

1 J. Thomas McCarthy & Roger E. Schechter, *Rights of Publicity and Privacy* (2d ed. Mar. 2026).....................................................................23, 24, 28

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) ....................................38

*Oxford English Dictionary* (3d ed. rev. 2010, online)............................................38

Restatement (Second) of Torts (1977).............................................22, 25, 26, 27, 28

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................................................................54

Sen. Comm. on Pub. Safety, Analysis of Assem. Bill No. 929 (Cal. Leg., 2015-16 Reg. Sess.) (June 15, 2015).......................................................45

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant CoStar Group, Inc. respectfully submits that oral argument would materially assist the Court's disposition of this appeal. This case presents an important question concerning standing under Article III of the U.S. Constitution based on the alleged collection and transmission of IP addresses voluntarily shared with websites, as well as a consequential question concerning the scope of the California Invasion of Privacy Act. Oral argument will assist the Court in resolving these issues.

## INTRODUCTION

Every time a person visits a website, the same unremarkable exchange occurs. The user's browser sends a request to the website's server. That request contains the user's Internet Protocol (IP) address—a numerical label assigned to the user's device that tells the website's server where to send the requested webpage. This IP address exchange is a basic building block of the internet; a website that does not receive the user's IP address literally cannot deliver content back to the user's screen.

Equally unremarkable is that website operators collect the IP addresses of those who visit their websites, and transmit them to third parties as part of standard website operations. Across the modern internet, website operators routinely employ lightweight code snippets—often called "pixels" or "tags"—that receive the same IP address the user's browser has already transmitted as part of loading the page. These tools use that address, along with generic metadata like browser type and timestamps, for prosaic purposes: ensuring website functionality, measuring advertising campaigns, providing users with targeted advertising, and helping website operators understand traffic patterns. And transmitting IP addresses to third parties extends well beyond analytics—it is also essential to cybersecurity functions such as anti-virus protection and fraud detection, which require checking user IP addresses against known threats. Ultimately, these tools are benign, background software employed by virtually every commercial website to improve user

experience and security. And none of these technologies can work without obtaining the user's IP address.

Over the past several years, a cottage industry of class-action litigation has emerged challenging precisely this foundational component of the modern internet. Enterprising plaintiffs' lawyers have filed thousands of lawsuits across the country against target companies asserting that the collection and onward transmission of user IP addresses violates California Penal Code § 638.51—a criminal provision of the California Invasion of Privacy Act (CIPA) prohibiting unauthorized "pen registers," devices traditionally attached to telephone lines to record the numbers dialed during outgoing calls. In this case, the litigation target is CoStar Group, Inc., a commercial real estate platform that operates Apartments.com and Homes.com. Plaintiffs' theory is that the commonplace website analytics tools on CoStar's websites are illegal "pen registers," subject to $5,000-per-violation statutory damages and possible criminal penalties. Taken seriously, this theory would criminalize virtually every commercial website accessible in the State of California.

Plaintiffs' theory is as wrong as it sounds. But it should not even get off the ground in federal court because Plaintiffs lack Article III standing to assert it. Article III requires plaintiffs to demonstrate a "concrete" injury bearing "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Popa v. Microsoft Corp.*, 153 F.4th 784, 789 (9th Cir. 2025)

(quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). And here, Plaintiffs have not plausibly alleged any concrete, cognizable harm from CoStar's alleged collection of their IP addresses.

Although Plaintiffs have principally tried to assert an invasion-of-privacy theory, that fails for the simple reason that IP addresses are not private. *See United States v. Rosenow*, 50 F.4th 715, 738 (9th Cir. 2022). Users voluntarily share their IP addresses with websites as part of accessing the internet. As *Popa* holds, the collection of such non-private information is not remotely similar to any traditionally recognized privacy harm. And while Plaintiffs also passingly suggest that they might have suffered an economic harm from these benign analytics tools, they do not substantiate that theory with anything concrete.

The district court reached the contrary conclusion based on a handful of pre-*Popa* decisions and the notion that, while collecting an IP address is a basic function of internet use that causes no harm, its onward transmission to third parties somehow creates a cognizable injury. That reasoning cannot survive *Popa* or *TransUnion*. Information that is not private does not become private merely because it is shared with an additional party, nor do Plaintiffs allege that this separate transmission creates any kind of traditionally cognizable concrete harm. "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417. The district court should have dismissed this case for lack of standing, and this Court should reverse its failure to do so.

Even if Plaintiffs have standing, their case also fails on the merits. Plaintiffs' sole theory of liability is that CoStar violated CIPA Section 638.51. As relevant here, that provision criminalizes the unauthorized use of "pen registers," a particular kind of surveillance instrument that records *destination* information in order to identify *other* devices that a target device is communicating with. Here, however, Plaintiffs claim that CoStar violated Section 638.51 by collecting website visitors' *own* IP addresses when they visit a CoStar website. That interpretation is at odds with the statute's text, directly contradicts its legislative history, and leads to absurdly broad criminal consequences the Legislature plainly did not intend. The district court's interpretive error provides an independent basis for reversal.

## STATEMENT OF JURISDICTION

The district court had statutory jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). *See* ER-25–27 (¶¶ 6-14). The district court lacked jurisdiction under Article III of the U.S. Constitution. *See infra* at 17-35.

This Court has jurisdiction under 28 U.S.C. § 1292(b). The district court entered its order denying CoStar's motion to dismiss on October 22, 2025. ER-8–15. The court then certified that order for interlocutory appeal under Section 1292(b) in an order entered on February 17, 2026. ER-4–7; *see* ER-96 (Dkt. No. 52) (noting that the order was "Entered: 02/17/2026"). CoStar timely petitioned this Court for

permission to appeal on February 27, 2026. ER-62–86. This Court granted the petition on March 18, 2026. ER-61.

## STATEMENT OF THE ISSUES

1. Whether the alleged collection and transmission to third parties of Plaintiffs' IP addresses, which Plaintiffs voluntarily shared with CoStar to access CoStar's websites, constitutes a cognizable Article III injury.

2. Whether software that captures website visitors' own IP addresses qualifies as a "pen register" under California Penal Code § 638.51.

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are contained in the addendum to this brief.

## STATEMENT OF THE CASE

### A. CIPA Statutory Background

California enacted the CIPA in 1967 against the backdrop of telephone-era eavesdropping. The Legislature's stated concern was the proliferation of devices and techniques used to listen in on private communications, and CIPA's original provisions were directed principally at wiretapping, recording, and intercepting telephone conversations. *See* Cal. Penal Code § 630; *Flanagan v. Flanagan*, 41 P.3d 575, 577 (Cal. 2002).

The statute, however, did not address two then-common tools of law enforcement related to telephone surveillance: pen registers and trap-and-trace

devices. "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released." *Smith v. Maryland*, 442 U.S. 735, 736 n.1 (1979) (citation omitted). A "trap and trace device records the originating telephone numbers of incoming telephone calls." *United States v. Carneiro*, 861 F.2d 1171, 1173 n.2 (9th Cir. 1988). These devices respectively capture the phone number associated with an outgoing or an incoming call; they do not record the contents of the calls.

Federal law has long regulated pen registers and trap-and-trace devices, and generally prohibits their use without court authorization. *See* 18 U.S.C. §§ 3121, 3127. But federal law also permits state law enforcement officers to use those tools in certain emergencies if acting "pursuant to a [state] statute." *Id.* § 3125(a). For decades, California had no such state statute. The absence of a state pen register statute created a Hobson's choice for California law enforcement—forgo the use of a pen register in an emergency, or use it and potentially violate federal law.

In 2015, the California Legislature filled the gap by enacting Assembly Bill 929, now codified at California Penal Code §§ 638.50-638.55. Section 638.51(a) provides that, except as otherwise provided, "a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51(a). As relevant here, the statute defines "pen register" as "a device or process that records or decodes dialing,

routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b). Sections 638.52 and 638.53 specify what such an order must contain. *See id.* § 638.52(d)(1), (3); *id.* § 638.53(a), (b). And the statute also contains a handful of narrow exceptions to the general prohibition, including an exception applicable "[i]f the consent of the user of [an electronic or wire communication] service has been obtained." *Id.* § 638.51(b)(5).

The statute carries serious consequences. Section 638.51 is a criminal prohibition: A violation is punishable by a fine, imprisonment, or both. Cal. Penal Code § 638.51(c). CIPA separately authorizes a private civil action by any person injured by a violation of the chapter, allowing recovery of the greater of $5,000 per violation or three times actual damages, along with injunctive relief, and it specifies that actual damages are not a prerequisite to suit. *Id.* § 637.2(a), (c).

### B. Factual Background

This case is one of many in which class action plaintiffs have tried to wield CIPA's pen register provision against websites for using ubiquitous software to collect IP addresses. The target in this case is CoStar, which operates Homes.com and Apartments.com. ER-25 (¶ 7). CoStar helps users find the right house or apartment by providing a transparent, information-rich website that connects them directly to properties, neighborhoods, and agents.

Plaintiffs allege that CoStar has partnered with third parties to install three types of software, which Plaintiffs call "Trackers," on the homepages of CoStar's websites. ER-24–25, ER-28–29 (¶¶ 2-3, 19-22). These Trackers—which consist of the "TikTok Pixel," the "LinkedIn Insight Tag," and the "Trade Desk/Adsrvr"—allegedly enable the third parties to receive, as relevant here, the "unique IP address" of those who visit CoStar's websites. ER-28–30 (¶¶ 21-23).

"IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005). Accordingly, "[e]very computer or server connected to the Internet has a unique IP address," which the user voluntarily conveys to any website visited for the "purpose of directing the routing of information" in the normal course of internet browsing. *United States v. Forrester*, 512 F.3d 500, 510 & n.5 (9th Cir. 2008). This Court has "analogized IP addresses … to the 'information people put on the outside of mail,'" which "'is voluntarily transmitted to third parties,'" and held that "there is no legitimate expectation of privacy in such information." *Rosenow*, 50 F.4th at 738 (citation omitted).

The technologies used by the so-called "Trackers"—"pixels, cookies, code snippets, and other technologies," *see* ER-24–25 (¶ 3)—are standard web analytics tools that website operators embed on their pages for commercial reasons.

Depending on the configuration, these tools can be used to collect and measure data regarding website traffic and functionality, analyze ad campaign performance, and deliver targeted advertising. A pixel is a "tiny, transparent image embedded in websites that collects information about website user behaviors and interactions." *Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410, 413 n.2 (5th Cir. 2024). For example, the TikTok Pixel collects website users' IP addresses and other metadata during the visit to measure traffic on the website, optimize advertising campaigns, and monitor advertising campaign performance. *See* ER-33 (¶ 34); *About TikTok Pixel*, TikTok Business Help Center (last updated Mar. 2025), https://ads.tiktok.com/help/article/tiktok-pixel.

Unlike pixels, cookies do not themselves collect IP addresses or other data; they merely allow the recipient to associate information with the same user across browsing sessions. *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 139 n.52 (3d Cir. 2015). Cookies are small text files placed on the user's browser by the website or by a third party. ER-29–30 (¶ 23); *see In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 268 (3d Cir. 2016). First-party cookies are used for functionality, personalization, and efficiency; third-party cookies are used for advertising, interactive content, and analytics. ER-29–30 (¶ 23); *Cookie Policy*, CoStar (last updated July 15, 2025), https://www.costar.com/about/cookie-policy.

When a user visits a website that has embedded one of these third-party tools, the user's browser—as part of the ordinary process of loading the webpage—transmits the user's IP address to the third-party platform that operates the tool. *See* ER-28–29 (¶¶ 20-21). Additional metadata and analytics information about the website visit—such as timestamps, device and browser information, button clicks, and referrer URLs—may also be transmitted. *See* ER-35–36, ER-42 (¶¶ 36, 48). This type of data collection is standard practice across the modern internet. *See* *Nickelodeon*, 827 F.3d at 266, 294-95; *Google*, 806 F.3d at 131-32.

**C. Proceedings Below**

1. Plaintiffs are five California residents who allegedly visited one or both of CoStar's websites. Although each Plaintiff's individual exposure to CoStar's websites is disjointed, "each Plaintiff allegedly visited at least one of [CoStar's] websites and had their IP addresses recorded and disseminated via [the Trackers]." ER-12; *see* ER-50–54 (¶¶ 68, 73, 80, 87, 95).

In April 2025, Plaintiffs filed this lawsuit in the Central District of California, asserting a single claim under Section 638.51 of CIPA, Cal. Penal Code § 638.51. ER-57–58 (¶¶ 108-16). As noted above, that provision prohibits the use of a "pen register"—defined as a device or process that captures "dialing, routing, addressing, or signaling information"—without a "court order" or user "consent." Cal. Penal Code §§ 638.50(b), 638.51(a)-(b). According to Plaintiffs, because the Trackers

capture website users' "IP addresses," they constitute a "'device or process'" that "'records or decodes dialing, routing, *addressing*, or signaling information.'" ER-57–58 (¶¶ 110-13) (emphasis added) (quoting Cal. Penal Code § 638.50(b)). And because Plaintiffs' IP addresses were captured "without their consent or a court order," they claim that the Trackers constitute illegal "pen register[]" activity under Section 638.51. ER-31 (¶ 27).

CoStar moved to dismiss on two grounds relevant here. First, CoStar argued that Plaintiffs lack Article III standing because they suffered no concrete harm from CoStar's collection and transmission of their IP addresses. CoStar explained that Plaintiffs lack a privacy interest in their IP addresses, which they voluntarily shared with CoStar on the internet. Second, CoStar argued that Plaintiffs' claim fails on the merits because collecting the IP addresses of those who visit CoStar's websites does not make the alleged Trackers "pen registers" under either the plain text of CIPA or applicable case law. The defining feature of a pen register is that it records destination information—information of other devices that the target device is communicating with—whereas Plaintiffs' theory here is that the Trackers recorded Plaintiffs' *own* IP addresses.

2. On October 22, 2025, the district court denied CoStar's motion. ER-8–15. The court first held that Plaintiffs have Article III standing based on their allegations of "IP address collection." ER-11–12. The court acknowledged that

"disclosing an IP address is a basic function of internet use." ER-12. But the court believed that the harm alleged here arises from "the documentation of IP addresses disclosed in the normal course of internet use that are then provided to third parties without Plaintiffs' consent." *Id.* In other words, the court reasoned, "the issue is not about Plaintiffs' expectation of privacy in transmitting their IP address to [CoStar] for *its* use, it is about [CoStar's] alleged transmission of the IP address to others with whom Plaintiff did not share the address." *Id.* The court also pointed to Plaintiffs' unadorned assertion that the "data underpinning targeted advertising is economically valuable." *Id.* Taken together, the court held, these allegations "as to the collection and dissemination of [Plaintiffs'] IP addresses allege a cognizable injury in fact." *Id.*

The court then held that Plaintiffs adequately stated a claim under Section 638.51. The court acknowledged CoStar's argument that pen registers historically recorded outgoing telephone numbers from a monitored line, and that, unlike traditional pen registers, the Trackers record source information—Plaintiffs' own IP addresses—rather than destination information. ER-12. But the court adopted the view that software may qualify as a pen register so long as it records "addressing information," regardless of whether that information identifies the sender or the recipient. ER-12–13. On that basis, the court stated that Plaintiffs' own IP addresses "would appear to fall, at the very least, in the 'addressing' category," and that the

alleged Trackers are "plainly a 'process'" that collects them. ER-13. And the court was unmoved by the prospect of exposing routine internet operations to CIPA liability, claiming that this case is different because Plaintiffs' "concern[]" in this case is not the collection of their IP addresses but rather the "*further* retention and transmission" of those addresses to third parties. *Id.*

3. CoStar then moved for interlocutory-appeal certification under Section 1292(b). As CoStar explained, the district court's holding on Article III standing departed sharply from the views of other district courts, which have rejected the precise theory of standing Plaintiffs assert here.[1]

In an order entered on February 17, 2026, the district court granted that motion and certified its October 22, 2025 order for interlocutory appeal. ER-4–7; *see* ER-96 (Dkt. No. 52) (order "Entered: 02/17/2026"). The court held that "each of the certification requirements" under Section 1292(b) is satisfied, and that obtaining appellate resolution on the Article III standing question "at this stage in this case—

---

[1] *See, e.g.*, *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179-83 (N.D. Cal. 2025); *Wooten v. BioLife Plasma Servs. L.P.*, 807 F. Supp. 3d 1139, 1144-46 (E.D. Cal. 2025); *Dawidzik v. Tesla, Inc.*, No. 25-cv-01982, 2025 WL 3786963, at *3-5 (C.D. Cal. Dec. 29, 2025); *Bradshaw v. Lowe's Cos.*, No. 25-cv-0742, 2025 WL 3171740, at *4-6 (S.D. Cal. Nov. 12, 2025); *Rodriguez v. Culligan Int'l Co.*, No. 25-cv-00225, 2025 WL 3064113, at *3-4 (S.D. Cal. Nov. 3, 2025); *Mitchener v. CuriosityStream, Inc.*, 815 F. Supp. 3d 845, 850-51 (N.D. Cal. 2025); *Kishnani v. Royal Caribbean Cruises Ltd.*, No. 25-cv-01473, 2025 WL 1745726, at *3-4 (N.D. Cal. June 24, 2025); *Xu v. Reuters News & Media Inc.*, No. 24-cv-2466, 2025 WL 488501, at *3-5 (S.D.N.Y. Feb. 13, 2025).

and across the many other cases within the district disagreeing about the same issue—will materially advance litigation both in this case and more broadly." ER-5–7. CoStar filed a timely petition for permission to appeal, ER-62–86, which this Court granted on March 18, 2026, ER-61.

## SUMMARY OF ARGUMENT

The district court should have dismissed this case for two independent reasons: Plaintiffs lack Article III standing, and they fail to state a viable claim under CIPA's pen register provision. This Court should reverse.

I. Plaintiffs lack Article III standing because they have not plausibly alleged a concrete injury. Their primary theory is that CoStar's collection and transmission of their IP addresses invaded their privacy. But as the Supreme Court held in *TransUnion* and this Court reiterated in *Popa*, Article III requires a concrete injury bearing a close relationship to a harm traditionally cognizable at common law. And at common law, there is no cognizable privacy harm absent the invasion or disclosure of *private* information.

IP addresses are not private. Internet users like Plaintiffs voluntarily share their IP addresses with websites in order to access those websites, and this Court has squarely held that internet users have no reasonable expectation of privacy in their IP addresses. Because IP addresses are not private, neither their collection nor their onward transmission is analogous to any traditionally cognizable privacy harm. The

district court's perceived distinction between collection and transmission is not grounded in the required common-law concrete-harm analysis. And under that analysis, the distinction is irrelevant: Non-private IP address information does not become private merely because it is shared with an additional party.

Plaintiffs' fallback economic-harm theory fares no better. Their sole allegation is a conclusory assertion that consumer data is "economically valuable." But Plaintiffs do not plausibly allege how they have been economically harmed in any way. They do not allege, for example, that anyone would have purchased their IP addresses from them, or that they have been prevented from deriving economic benefit from that information. This bare assertion falls far short of establishing a concrete economic injury.

II. Even if Plaintiffs could demonstrate standing, their claim under CIPA Section 638.51(a) fails on the merits. That statute prohibits the unauthorized use of "pen register[s]," which are defined as devices that record "dialing, routing, addressing, or signaling information." Cal. Penal Code § 638.50(b). Plaintiffs' theory that this statute covers the collection and transmission of internet user IP addresses misses the mark in two ways.

*First*, the statute's text, structure, and history all demonstrate that the "addressing information" collected by a pen register is *destination* information—the addresses of other devices with which the target device is communicating. That

destination-based understanding of pen registers has been established for at least half a century. And that understanding is embedded in CIPA itself, which establishes an authorization regime for pen registers that is focused on obtaining destination information (who the user is calling) and separately regulates trap-and-trace devices that collect source information (who is calling the user). In other words, pen registers and trap-and-trace devices are designed to capture addresses of *other* devices with which a target device is communicating—not the address of the target device *itself*. As multiple California courts have recognized, applying a pen register statute to software that collects internet users' own IP addresses stretches that statute beyond its breaking point, defies the ordinary understanding of pen registers, and would criminalize the routine operation of virtually every commercial website.

*Second*, and more fundamentally, Section 638.51 does not extend to online data collection at all. A pen register is a telephone-specific device. The pen register statute was thus enacted for the specific purpose of regulating telephone surveillance; the compliance provisions presuppose a telephone line; and the 2015 Legislature that enacted this provision never mentioned websites or the internet. This alternative argument is equally dispositive of Plaintiffs' claim.

In holding otherwise, the district court ignored all of those indicia of statutory meaning and instead fixated on individual words of the definition provision in isolation. That interpretive approach is misguided. When properly construed,

Section 638.51 does not encompass the allegations in this case. The district court's contrary decision should be reversed, and Plaintiffs' claim should be dismissed.

## STANDARD OF REVIEW

This Court reviews a district court's "standing determinations de novo," *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1054 (9th Cir. 2022), and likewise "review[s] de novo a district court's denial of a motion to dismiss for failure to state a claim," *McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 886 (9th Cir. 2020).

## ARGUMENT

### I. PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' case fails at the threshold because they have not plausibly alleged Article III standing. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (citation omitted). To establish Article III standing, the plaintiff must "show that she has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (quoting *California v. Texas*,

593 U.S. 659, 668-69 (2021)). The alleged "injury in fact" must be "concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423-24.

Plaintiffs have failed to plausibly allege that they suffered a concrete injury from CoStar's alleged collection of their own voluntarily-disclosed IP addresses. Their privacy-based theory fails due to the lack of any privacy interest that was invaded. And their alternative economic harm theory fails due to the lack of plausible, non-conclusory allegations supporting it. The district court erred in allowing this case to proceed, and its decision should be reversed.

### A. Plaintiffs' Privacy-Based Theory Of Standing Fails

The district court relied primarily on Plaintiffs' privacy-based theory of standing, suggesting that Plaintiffs suffered an invasion of privacy due to the "collection and dissemination of their IP addresses." ER-11–12. This theory is foreclosed by this Court's decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025), which makes clear that the kind of privacy-based "harm" alleged by Plaintiffs in this case—which does not even involve any private information—is not sufficiently concrete to satisfy Article III.

#### 1. Article III Requires A Concrete Injury With A Close Relationship To Harms Traditionally Cognizable At Common Law

The first element of Article III standing requires the plaintiff to allege facts demonstrating that she "suffered an injury in fact that is concrete, particularized, and

actual or imminent." *TransUnion*, 594 U.S. at 423. To be "concrete," the "injury 'must actually exist'"; it "must be 'real, and not abstract.'" *Popa*, 153 F.4th at 788 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). And the "touchstone for concreteness" is "history"—the alleged injury must bear a "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 789 (quoting *TransUnion*, 594 U.S. at 424). These parameters ensure that federal courts "decide only matters 'of a Judiciary Nature'" that involve "'real controvers[ies] with real impact on real persons.'" *TransUnion*, 594 U.S. at 424 (citations omitted).

This concreteness requirement persists "'even in the context of [an alleged] statutory violation'"—the plaintiff must show that she "ha[s] been *concretely harmed* by [the] defendant's statutory violation" to file suit in federal court. *TransUnion*, 594 U.S. at 426-27 (citation omitted); *see Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 993 (9th Cir. 2023) ("[F]or Article III purposes, it is not enough for a plaintiff to allege that a defendant has violated a right created by a statute; we must still ascertain whether the plaintiff suffered a concrete injury-in-fact due to the violation." (citation omitted)). In other words, courts "cannot treat an injury as 'concrete' for Article III purposes based only on [a legislature's] say-so" in a statute. *TransUnion*, 594 U.S. at 426 (citation omitted). Plaintiffs alleging a

statutory violation must still establish that they “ha[ve] suffered a harm that has traditionally been actionable in our nation’s legal system.” *Popa*, 153 F.4th at 791.

Both *TransUnion* and *Popa* establish the framework for applying the concreteness requirement in the context of privacy statutes. The critical “inquiry [is] whether [the] plaintiffs have identified a close historical or common-law analogue for their asserted injury” that was traditionally justiciable in court. *TransUnion*, 594 U.S. at 424. That inquiry cannot be “pitched at a high level of generality,” which means that plaintiffs cannot rely on a “broad theory that the common law protected privacy rights.” *Popa*, 153 F.4th at 792. That is because “there existed no free-roaming privacy right at common law but rather four discrete torts that protected specific kinds of privacy-related harms”—(1) “‘intrusion upon seclusion,’” (2) “‘appropriation of another person’s name or likeness,’” (3) “‘publicity given to another person’s private life,’” and (4) “‘publicity that places one in a false light.’” *Id.* (citation omitted). To satisfy Article III’s concreteness requirement, therefore, the alleged harm must be “benchmarked to [one of these] specific tort[s].” *Id.* at 791-92. And while an “exact duplicate” is not required, the alleged harm caused by the statutory violation must “bear[] a sufficiently close relationship to the harm” underlying the common-law analogue. *TransUnion*, 594 U.S. at 433; *see Popa*, 153 F.4th at 790-91.

*Popa* illustrates how those principles apply in a case like this one. The plaintiff in *Popa* claimed that the defendant's use of "session-replay" technology—a website code that records a user's browsing behavior on the website to improve website effectiveness—violated a state wiretapping statute. 153 F.4th at 786-87. This Court held that the plaintiff failed to establish Article III standing to pursue that claim. The Court rejected the plaintiff's argument that the alleged violation of "a statute protecting a substantive privacy right" was itself enough to "satisfy Article III." *Id.* at 792. That argument, the Court explained, "does not align with the analysis adopted in *TransUnion*," which requires "'a close historical or common-law analogue'" even in the context of a statutory violation. *Id.* at 792-94 (quoting *TransUnion*, 594 U.S. at 424).

This Court also held that the plaintiff's alleged privacy harm—"the tracking of her interactions with the [defendant's] website"—was not analogous to the specific privacy harms "actionable at common law." *Id.* at 791. To the contrary, the Court explained, tracking a user's interactions with a website is akin to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." *Id.* The plaintiff's allegations therefore did not establish a concrete injury in fact as required by Article III. *Id.*

### 2. The Alleged Collection And Transmission Of Plaintiffs' IP Addresses Does Not Establish A Cognizable Privacy-Based Harm

Plaintiffs cannot satisfy the concreteness requirement in this case. Plaintiffs claim that CoStar violated Section 638.51 of CIPA by using software that captured their "'routing, addressing, or signaling information'"—namely, "the[ir] IP addresses"—without "consent" or a "court order." ER-58 (¶¶ 110-11, 114-15). Although Plaintiffs claim that this conduct infringed on their privacy rights, ER-24 (¶ 1), Plaintiffs have not "identified a close historical or common-law analogue for [that] asserted injury," *Popa*, 153 F.4th at 789 (quoting *TransUnion*, 594 U.S. at 424). Indeed, Plaintiffs have only briefly floated two common-law analogues as possibilities—public disclosure of private facts and intrusion upon seclusion. *See* Plaintiffs' Ans. to Pet. for Permission to Appeal 8-9 (Case No. 26-1160, ECF No. 4) (Plaintiffs' 1292(b) Opp.). Those are the same two theories that were advanced in *Popa*. And here, as in that case, "[b]oth analogies falter." *Popa*, 153 F.4th at 791.

**a. *Public Disclosure of Private Facts.*** The tort of "public disclosure of private facts" "requires that a defendant 'gives publicity' to a matter that concerns 'the private life of another,' that the information would be 'highly offensive to a reasonable person,' and that the information is not of legitimate public concern." *Popa*, 153 F.4th at 791 (emphasis omitted) (quoting Restatement (Second) of Torts

§ 652D (1977)). Plaintiffs' attempt to analogize to this tort fails for two independent reasons.

*First*, IP addresses are not private information. As its name implies, this tort protects against the disclosure of "*private* facts"—that is, "sensitive" personal information in which a person maintains a reasonable expectation of privacy. *Popa*, 153 F.4th at 791 (emphasis added); *see* 1 J. Thomas McCarthy & Roger E. Schechter, *Rights of Publicity and Privacy* § 5:69 (2d ed. Mar. 2026) (McCarthy) (explaining that the inquiry "usually turns on whether the plaintiff has a reasonable expectation of privacy concerning the information"). In *Popa*, the Court made clear that plaintiffs cannot analogize to this tort for purposes of Article III standing unless the information at issue is "embarrassing, invasive, or otherwise private." 153 F.4th at 791; *accord, e.g.*, *Cook v. GameStop, Inc.*, 148 F.4th 153, 159 (3d Cir. 2025) (rejecting analogy where information "was not sensitive or personal"); *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 979 (7th Cir. 2023) (same).

That holding controls here because Plaintiffs' IP addresses are not private. As this Court has explained, internet users "ha[ve] no expectation of privacy in IP addresses." *United States v. Rosenow*, 50 F.4th 715, 738 (9th Cir. 2022) (internal alteration omitted) (quoting *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008)). That is because, when internet users visit a website, they "voluntarily turn[] over" their IP addresses to the website in order to "direct[] the routing of

information." *Forrester*, 512 F.3d at 510; *see supra* at 8. Indeed, this voluntary disclosure is, as the district court put it, "a basic function of internet use." ER-12; *see, e.g.*, *Kleffman v. Vonage Holdings Corp.*, 232 P.3d 625, 627 (Cal. 2010) (noting that IP addresses must be exchanged "[i]n order for the Internet to function" (citation omitted)). As a result, "the disclosure of IP addresses does not raise privacy concerns because 'no reasonable person could maintain a privacy interest in that sort of information.'" *Rosenow*, 50 F.4th at 738 n.10 (citation omitted). As a prominent treatise explains, "[b]asic routing information transmitted while visiting public web sites online is … not considered private or intimate." 1 McCarthy § 5:69; *see also, e.g.*, *Xu v. Reuters News & Media Inc.*, No. 24-cv-2466, 2025 WL 488501, at *5 (S.D.N.Y. Feb. 13, 2025) ("[T]he cases are legion holding that a person does not have a legitimate expectation of privacy in an IP address which he voluntarily turned over to a third party in order to access its website.").

This Court's reasoning in *Popa* confirms that the collection of IP addresses lacks the requisite close relationship to a traditionally cognizable harm. As noted above, the claim in *Popa* concerned "session-replay" technology that tracked a website visitor's browsing behavior. 153 F.4th at 786. The tracking was extensive, capturing "30 different categories" of information, including "mouse movements, clicks, keystrokes, URLs of web pages visited," "the date a user visited the website, the device the user accessed the website on, the type of browser the user accessed

the website on, the operating system of the device used to access the website, the country where the user accessed the website from, a user's mouse movements, a user's screen swipes, text inputted by the user on the website, and how far down a webpage a user scrolls." *Id.* at 786 (internal alteration omitted). And yet the Court rejected the tort analogy for purposes of Article III standing, explaining that this browsing information is not similar to the kind of "embarrassing, invasive, or otherwise private information" underlying the tort of disclosure of private facts. *Id.* at 791; *accord, e.g.*, *Cook*, 148 F.4th at 159-60 (reaching same conclusion). If capturing a plaintiff's browsing behavior is insufficient to establish standing on this theory, the mere collection of an IP address—which reveals even less about the user and is voluntarily transmitted as part of using the internet—cannot suffice either.[2]

[2] *Popa* also fully answers Plaintiffs' attempt, in their opposition to interlocutory review, to shift the focus to the collection of non-IP address information, such as browser and device information, referrer URLs, button clicks, ads shown, and hashed email addresses. *See* Plaintiffs' 1292(b) Opp. 2. That information is no more private than the information collected in *Popa*. And in any event, that information is irrelevant for purposes of Article III standing because it is divorced from Plaintiffs' claim. Plaintiffs' sole theory of liability is that CoStar used a "device or process that records or decodes dialing, routing, addressing, or signaling information." ER-57–58 (¶¶ 110-11) (quoting Cal. Penal Code § 638.50(b)). And per Plaintiffs' complaint, the *only* information that allegedly falls within that definition consists of their "IP addresses." ER-58 (¶¶ 111, 113). Any injury from the collection of non-IP address information is not "'fairly traceable' to the *'allegedly unlawful conduct'* of which [Plaintiffs] complain." *California*, 593 U.S. at 668-69 (emphasis added); *see, e.g.*, *Bradshaw v. Lowe's Cos.*, No. 25-cv-0742, 2025 WL 3171740, at *4-5 (S.D. Cal. Nov. 12, 2025) (rejecting standing based on non-IP address allegations).

*Second*, Plaintiffs' analogy independently fails on the "public disclosure" prong. The public-disclosure tort protects against the disclosure of private information that "reaches, or is sure to reach, the public." Restatement (Second) of Torts § 652D cmt. a. This means "communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* "[I]t is not an invasion of the right of privacy ... to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id.* Thus, while "the information need not be broadcast to the whole world, it must be accessible to many." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 425 (4th Cir. 2025).

Accordingly, as several circuits have held, this tort cannot serve as an analogy for purposes of Article III standing absent publicity of the information at issue. *See, e.g.*, *id.* at 425-26; *Cook*, 148 F.4th at 160; *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735-36 (7th Cir. 2023); *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 829 (10th Cir. 2022); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245-46 (11th Cir. 2022) (en banc); *cf. TransUnion*, 594 U.S. at 434 n.6 ("[T]he plaintiffs' internal publication theory circumvents a fundamental requirement of an ordinary defamation claim—publication—and does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing.").

Here, Plaintiffs do not allege that CoStar disclosed their IP addresses to the public at large. Instead, they allege that their IP addresses were shared with only three third-party advertising vendors—TikTok, LinkedIn, and Trade Desk. *See* ER-31, ER-41, ER-47 (¶¶ 28, 43, 56). That narrow universe of recipients does not bear a close relationship to the traditional tort, which protects against widespread disclosure to the broader public. *See, e.g.*, *Cook*, 148 F.4th at 160 (holding that allegations concerning "disclosure of information to Microsoft, a third-party vendor to GameStop, not the broader public," were "not analogous to the harm associated with the tort of disclosure of private information").

**b.** ***Intrusion Upon Seclusion.*** Plaintiffs' other proposed common-law analogue, intrusion upon seclusion, also fails. The tort of "intrusion upon seclusion" requires "'an intentional interference with [the plaintiff's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.'" *Popa*, 153 F.4th at 791 (emphasis and citation omitted); *see* Restatement (Second) of Torts § 652B. This tort protects against the "investigation or examination into [a person's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court

order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B.[3]

Accordingly, like Plaintiffs' first common-law analogue, this tort also hinges on the plaintiff having an "objectively reasonable expectation of privacy" in the matter intruded. *Med. Laboratory Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812-14 (9th Cir. 2002); *see* 1 McCarthy § 5:93 ("A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion." (citation omitted)). And *Popa* makes clear that the tort of intrusion upon seclusion cannot serve as a common-law analogue for purposes of establishing Article III standing absent the "infringement of … such privacy interest." 153 F.4th at 791; *see, e.g.*, *Cook*, 148 F.4th at 160 (rejecting analogy where browsing information accessed by the defendant was not "personal or sensitive," such that the plaintiff suffered no intrusion of her "private affairs"); *Phillips*, 74 F.4th at 995-96 (same where the plaintiffs failed to "show that the type of information" held by the defendant was "so sensitive that another's access to that information 'would be highly offensive to a reasonable person'" (quoting Restatement (Second) of Torts § 652B)).

---

[3] This tort also protects against interference with a person's solitude, such as through disruptive, unsolicited communications. *See, e.g.*, *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117-18 & n.6 (9th Cir. 2022). But Plaintiffs do not allege any such interference here. To the contrary, they allege that the Trackers operated in the background of CoStar's websites and that they were unaware of them. ER-24–25, ER-50–54 (¶¶ 3, 69, 74, 81, 88, 96).

Once again, *Popa* is dispositive: As explained above, internet users have no legitimate expectation of privacy in their IP addresses. *See supra* at 23-25. Indeed, unlike opening a person's mail, searching their wallet, or examining their bank account, collecting non-private IP addresses that are voluntarily conveyed by internet users to every website they visit does not intrude on any seclusion or solitude. Thus, "for the same reasons discussed above for the tort of disclosure of private facts," Plaintiffs' alleged harm "is not analogous to the harm associated with intrusion upon seclusion." *Cook*, 148 F.4th at 160.

### 3. The District Court's Contrary Holding Is Meritless

The district court seemed to agree that internet users have no expectation of privacy in IP addresses. ER-12. But the court nevertheless concluded that Plaintiffs adequately alleged a privacy-based theory of standing for two reasons. Neither works.

*First*, the court relied on three district court cases—all predating *Popa*—holding that "CIPA claims for IP address collection similar to Plaintiffs' establish standing." ER-11–12 (citing *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 932 (N.D. Cal. 2024); *Mirmalek v. Los Angeles Times Commc'ns LLC*, No. 24-cv-01797, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024); *Keskinen v. Lush Handmade Cosms. LLC*, 770 F. Supp. 3d 1234, 1244 (C.D. Cal. 2025)).

Two of the district court's cases—*Shah* and *Mirmalek*—did not even discuss Article III standing. Those decisions instead concerned "statutory standing" under CIPA. *Shah*, 754 F. Supp. 3d at 932; *see Mirmalek*, 2024 WL 5102709, at *4 (relying on *Shah*'s analysis of "statutory standing"). They are therefore irrelevant: The "issue of *statutory* standing … has nothing to do with whether there is a case or controversy under Article III." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998). "[S]tatutory standing" merely asks "whether [the plaintiff] has a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). And as *TransUnion* stresses, that statutory question is distinct from the question of Article III standing: "[U]nder Article III, an injury in law is not an injury in fact." 594 U.S. at 426-27. Thus, "authorities analyzing statutory standing [under CIPA], but not Article III standing, do not bear on [the Article III] question." *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1182 n.5 (N.D. Cal. 2025).

Only the district court's third case—*Keskinen*—discussed Article III standing. And the reasoning in that case cannot be reconciled with *Popa*. *Keskinen* relied on the proposition that "violations of plaintiffs' statutory rights under CIPA, even without more, constitute injury in fact because instead of a bare technical violation of a statute, … a CIPA violation involves … a violation of privacy rights." 770 F. Supp. 3d at 1244 (alterations in original) (citation omitted). That is precisely the

argument that *Popa* rejected—"that a plaintiff *necessarily* enjoys Article III standing when suing under a statute that protects a substantive right to privacy." 153 F.4th at 792-93. That position, *Popa* explained, "finds no support in *TransUnion*," which held, "without any limitation, that courts should assess whether 'plaintiffs have identified a close historical or common-law analogue for their asserted injury.'" *Id.* at 794 (quoting *TransUnion*, 594 U.S. at 424). Merely claiming the violation of "a statute protecting a substantive privacy right" is insufficient. *Id.* at 792. So none of the district court's cited authorities holds water.

*Second*, the district court claimed that Plaintiffs' real "concern" is not CoStar's collection of Plaintiffs' IP addresses "for *its* use," but instead CoStar's "alleged *transmission* of the IP address[es] to others with whom Plaintiff[s] did not share the address[es]." ER-12 (second emphasis added). But that distinction makes no difference under the common-law concrete-harm analysis required by *Popa* and *TransUnion*.

As explained above, the common-law privacy torts invoked by Plaintiffs to support standing require the intrusion into or disclosure of a *private* matter—and IP addresses are not private. *See supra* at 23-25, 27-29. CoStar's alleged transmission of those non-private IP addresses to third parties does not somehow turn them private or otherwise create a traditionally cognizable harm. That is why district courts have had no trouble concluding that the "alleged collection *and/or disclosure* of [IP

address] information to third parties does not give rise to the type of injury recognized at common law" sufficient to support Article III standing. *Xu*, 2025 WL 488501, at *3-5 (emphasis added); *see Khamooshi*, 786 F. Supp. 3d at 1179-80. And it is why the district court in this case unsurprisingly failed to cite a single case supporting its collection/transmission distinction or otherwise explain how the transmission invaded Plaintiffs' privacy.[4]

Plaintiffs' attempt to analogize to the tort of public disclosure of private facts confirms the district court's error. That tort assumes that there will be a "transmission" to others—indeed, to the public at large. And yet "a crucial ingredient" of that tort "is a public disclosure of *private facts*." *Sipple v. Chron. Publ'g Co.*, 201 Cal. Rptr. 665, 668 (Ct. App. 1984); *see also, e.g.*, *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 146 (Ala. 2019) ("It is axiomatic ... that a claim of invasion of privacy based on a defendant's giving publicity to private information about the

[4] The district court concluded that Plaintiffs' "concern is with the documentation of IP addresses disclosed in the normal course of internet use that are then provided to third parties without Plaintiffs' consent or other compliance with CIPA." ER-12. But CIPA does not regulate this second-order sharing. And Plaintiffs' consent would be necessary only if the information were private or if CoStar had promised not to share the IP addresses with third parties. *Cf. Cook*, 148 F.4th at 162 (distinguishing cases where "the 'plaintiffs alleged that a third party … tracked their personal internet browsing information in violation of the third party's own promises not to do so'" (alteration in original) (citation omitted)). But absent allegations like that, the mere sharing of non-private information does not demonstrate a concrete injury.

plaintiff can succeed only if the plaintiff can prove that the publicized information was actually private at the time it was publicized."). The transmission of non-private information is not a privacy harm recognized at common law.

That conclusion is also consistent with the privacy interests in the Fourth Amendment context. When individuals "lack … any legitimate expectation of privacy" in "information voluntarily conveyed" to third parties, that lack of privacy persists "even if the information is revealed on the assumption that it will be used only for a limited purpose." *United States v. Miller*, 425 U.S. 435, 442-43 (1976). Thus, if non-private information is voluntarily disclosed to a bank, it does not constitute a privacy violation if the bank discloses it to the government. *Id.* This Court has applied the same rationale in the context of IP addresses: Because internet users "'ha[ve] no expectation of privacy in [their] IP addresses,'" a website's "disclosure of [their] IP addresses" to the government "does not raise privacy concerns." *Rosenow*, 50 F.4th at 737-38 & n.10 (citation omitted).

So too here. Plaintiffs voluntarily conveyed their IP addresses to CoStar as a mechanism for accessing the websites they visited. Plaintiffs do not have a reasonable expectation of privacy in their IP addresses voluntarily conveyed to CoStar, and that remains true even if those IP addresses are transmitted to third parties like TikTok, LinkedIn, and Trade Desk. The supposed "harm" Plaintiffs

claim from that alleged transmission is simply not "a harm that has traditionally been actionable in our nation's legal system." *Popa*, 153 F.4th at 791.

### B. Plaintiffs' Alternative "Economic Harm" Theory Fails

To find standing, the district court also pointed to Plaintiffs' allegation that the "collection and transmission [of their IP addresses] economically harms Plaintiffs, because such data underpinning targeted advertising is economically valuable." ER-12. This allegation is entirely conclusory and cannot support standing.

As the parties invoking Article III jurisdiction, "Plaintiffs bear the burden" to plausibly and "'clearly allege facts demonstrating' each element" of Article III standing; conclusory or speculative allegations are insufficient. *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 523-25 (9th Cir. 2023) (internal alteration omitted) (quoting *Spokeo*, 578 U.S. at 338); *see Popa*, 153 F.4th at 791 & n.5. This Court has thus repeatedly rejected alleged "economic" injuries that are "conclusory and unsupported by any facts." *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723-24 (9th Cir. 2017); *see, e.g.*, *Grizzly Gen. Contractors Corp. v. Kitsap Pub. Health Dist.*, No. 25-2183, 2026 WL 753173, at *1 (9th Cir. Mar. 17, 2026) (denying standing where "the assertion of economic harm is conclusory and lacks sufficient factual allegations to plausibly support economic injury").

Here, Plaintiffs' alleged economic injury consists of a single paragraph asserting that the "information obtained and distributed by CoStar has significant economic value because consumers' personal information is viewed as a form of currency in the e-commerce industry," and that Plaintiffs "suffer economic injury as a result of CoStar's access and use of their personal information." ER-30–31 (¶ 26). This allegation is devoid of any concrete facts—the vague references to "economic value" and "economic injury" are totally conclusory.

More fundamentally, the theory of economic injury is unexplained. Even if Plaintiffs are right that consumer information is valuable in the e-commerce industry, "it does not follow that the same information, when not disclosed, has independent economic value to an individual user." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019). And even if it does have some independent economic value, Plaintiffs do not explain how that value has been harmed. Plaintiffs do not, for example, plausibly allege that "'someone else would have bought [their information] as a stand-alone product'" from them, nor do they plausibly allege that they "are prevented from deriving economic benefit from this information in the future." *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1054-55 (N.D. Cal. 2022) (citation omitted). Plaintiffs' bare assertion that their IP addresses have "economic value" falls far short of establishing a concrete economic injury in fact. Their case fails for lack of standing.

## II. PLAINTIFFS FAIL TO STATE A VIABLE CLAIM UNDER CIPA'S PEN REGISTER PROVISION

Even if Plaintiffs could demonstrate standing, this case still should have been dismissed because Plaintiffs failed to state a claim under Section 638.51. That provision prohibits the unauthorized use of "pen registers," which are devices that track destination addresses (such as dialed telephone numbers) of other people. The software alleged here—which merely collected Plaintiffs' *own* IP addresses when they accessed CoStar's websites—does not constitute an illegal pen register. The district court's contrary conclusion rests on a boundless interpretation of CIPA, and that error independently warrants reversal.[5]

### A. Software That Collects Website Visitors' IP Addresses Is Not A "Pen Register"

Plaintiffs bring a single claim under CIPA Section 638.51, which as relevant here prohibits the "use [of] a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51(a). The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b).

---

[5] This Court may reverse based on any issue decided by the district court in the order certified for interlocutory appeal. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204-05 (1996).

The proper interpretation of this statute rests on "[t]he statute's language, structure, subject matter, context, and history," which "are all 'factors that typically help courts determine a statute's objectives and thereby illuminate its text.'" *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124 (9th Cir. 2024) (citation omitted); *accord Ardon v. City of Los Angeles*, 366 P.3d 996, 999-1000 (Cal. 2016). Those factors point in the same direction: Software that merely collects website users' own IP addresses is not a "pen register." That is because such software lacks two defining features of pen registers: (1) pen registers record information about devices with which the target device is communicating (i.e., destination information about who the user is communicating with), rather than information about the target device itself (i.e., source information); and (2) pen registers record telephonic data rather than online data. The software alleged here exhibits neither characteristic and thus falls outside the scope of Section 638.51.

### 1. Pen Registers Record Information About Where A User's Communication Is Going, Not Source Information Like The User's Own IP Address

The text, structure, and history of the statute all confirm that a "pen register" is a device that records the "addressing information" of a communication's *destination*, not the address of the person sending the communication.

a. For starters, the statutory text and context demonstrate that "addressing information" in the pen register definition is referring to destination information.

The word "addressing," as used in the statute, derives from the verb "to address," whose primary transitive meaning in the context of communications is "[t]o direct (a written communication) to a specific person or destination." *Oxford English Dictionary* (3d ed. rev. 2010, online) (*OED Third*); *see also, e.g.*, *American Heritage Dictionary of the English Language* 20 (5th ed. 2011) ("To mark with a destination"); *Merriam-Webster's Collegiate Dictionary* 14 (11th ed. 2014) ("to mark directions for delivery on").

In ordinary speech, when one "addresses" a letter, one specifies where it is going. The same is true in the digital era, where "address" means "to direct (an email) to a specific person or address," or "to specify a location in (memory) or the location of (data) by means of an address, with a view to transferring data." *OED Third*, *supra*. Thus, while it may be true that "IP addresses" are "addresses" in a colloquial sense, *see* ER-13, the phrase "addressing information" in Section 638.50(b)'s pen register definition most naturally refers to the act of specifying where the communication is being directed, not where it is coming from.

Any doubt about that understanding is dispelled by the ordinary meaning of "pen register," the term being defined. "In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 572 U.S. 844, 861 (2014); *see United States v. Stevens*, 559

U.S. 460, 474 (2010) (noting that "an unclear definitional phrase may take meaning from the term to be defined"). Accordingly, both this Court and the Supreme Court "frequently consider[] the ordinary meaning of a statutorily defined term." *Zellmer*, 104 F.4th at 1124.

In *Zellmer*, for example, this Court applied that principle to a state statute that defined "biometric identifiers" as "retina or iris scans, fingerprints, voiceprints, or scans of hand or face geometry." *Id.* The Court held that this broad definition was cabined by the ordinary meaning of the term being defined—"biometric identifiers"—such that "scans of face geometry" were not "covered by [the statute] if they cannot identify a person." *Id.* at 1123-24.

The Supreme Court applied a similar approach in *Bond* when interpreting a statutory definition of "chemical weapon" that broadly included "toxic chemicals." 572 U.S. at 850, 861-62. Standing alone, the ordinary meaning of "toxic chemicals" may have been broad enough to reach common chemicals under the sink. *Id.* at 862. But the Court rejected that interpretation, holding that the term "toxic chemicals" was cabined by the defined term itself—"chemical weapons"—and thus excluded household chemicals, which "no one would ordinarily describe ... as 'chemical weapons.'" *Id.* at 861-62. Similar examples abound. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 672 (2023) (interpreting "waters of the United States" to "align ... with the term it is defining: 'navigable waters'"); *Johnson v. United States*, 559 U.S. 133,

136, 142 (2010) (interpreting "physical force" to require "violent force" because it appeared in the statutory definition of "violent felony").

That principle applies with full force here. The term being defined here is "pen register." Cal. Penal Code § 638.50(b). And "pen register" is a term of art with a settled historical meaning. As the Supreme Court explained nearly half a century ago, "[a] pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released." *Smith v. Maryland*, 442 U.S. 735, 736 n.1 (1979) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 161 n.1 (1977)). This Court has likewise explained that "[a] pen register is a device that records the numbers dialed from a monitored telephone." *United States v. Taketa*, 923 F.2d 665, 668 n.1 (9th Cir. 1991); *see also, e.g.*, *Graf v. Zynga Game Network, Inc. (In re Zynga Priv. Litig.)*, 750 F.3d 1098, 1108 (9th Cir. 2014) (noting that "pen registers … capture only the telephone numbers that are dialed"). And the California Supreme Court has also long understood that "[a] pen register is a mechanical device which records the numbers dialed from a telephone." *People v. Blair*, 602 P.2d 738, 747 n.11 (Cal. 1979). In all of these formulations, the pen register is capturing the destination of outgoing information—the telephone numbers being *dialed*.

Against that backdrop, the statutory adjectives in the pen register definition—"dialing, routing, addressing, or signaling"—are properly limited to destination

information of the kind a pen register captures. Thus, assuming the pen register statute applies to the collection of IP addresses at all, *but see infra* at 49-52, its application would be limited to a device that records the IP addresses of every website an internet user is visiting. Indeed, this Court analogized to traditional pen registers in *Forrester*, which concerned the government's ability to capture "IP addresses of the websites [internet users] visit." 512 F.3d at 509-10. The analogy works because the equivalent of a number dialed on a telephone would be the destination IP address of the website visited.

In this case, however, Plaintiffs allege that the software at issue collected *their own* IP addresses when they visited CoStar's websites. *See* ER-50–54 (¶¶ 68, 73, 80, 87, 95). The recorded IP address in this context is analogous to the caller's own telephone number—the originating source of the communication. That is fundamentally different from what a "pen register" captures. Thus, even if the term "addressing information" might potentially be broad enough to sweep in source IP addresses, no one would describe a device that captures such information as a "pen register." Limiting the terms in Section 638.50(b) to destination information mitigates the "dissonance between that ordinary meaning and the reach of the definition." *Zellmer*, 104 F.4th at 1123 (quoting *Bond*, 572 U.S. at 861).

b. The surrounding statutory context confirms that the definition of pen register follows the ordinary meaning.

*First*, the statutory scheme is built on the premise that a pen register tracks destination information. Section 638.51 prohibits installing or using a pen register "without first obtaining a court order pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51(a). These cross-referenced provisions define the compliance pathway that gives Section 638.51 its operative force. And these provisions are focused on recording destination information. Section 638.52 requires that an *ex parte* order authorizing the use of a pen register "shall specify" "[t]he identity, if known, of the person to whom is leased or in whose name is listed the telephone line to which the pen register or trap and trace device is to be attached," and "[t]he number and, if known, physical location of the telephone line to which the pen register … is to be attached." *Id.* § 638.52(d)(1), (3). The statute thus anticipates that an applicant for a pen register will already know the phone number of the person making the outgoing communication. The application is seeking to capture the destination information of the *outgoing* calls. *See, e.g.*, ER-21 (pen register application to "register numbers dialed or pulsed from the telephone line").

*Second*, the statute shows that, if the California Legislature wanted to draft the pen register definition to capture source information, it knew how to do so. Section 638.51(a) prohibits the use of "a pen register or a trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a). A trap-and-trace device is "a device or process that captures the incoming electronic or other

impulses" identifying "the *originating* number" or other information "reasonably likely to identify the *source* of a wire or electronic communication." *Id.* § 638.50(c) (emphasis added).

Plaintiffs do not assert that the software at issue here is a trap-and-trace device, and for good reason. Like a pen register, a trap-and-trace is designed to capture information of *other devices* with which a target device is communicating: A pen register captures outgoing destination information (a list of all telephone numbers dialed from the device), while a trap-and-trace captures incoming source information (a list of all telephone numbers calling a device). The definition of a trap-and-trace thus requires that the software be placed on the recipient's device, such that the tracked information is "incoming," *id.*—whereas here Plaintiffs allege that the software is placed on their devices and causes their browser to send information, ER-28–29 (¶¶ 20-21). But the critical point is that the California Legislature expressly accounted for devices that track source information about incoming communications in the trap-and-trace definition. Interpreting the "pen register" definition to also sweep in such information would thus not only depart from the ordinary understanding of pen registers but also undermine that legislative distinction.

c. The legislative history underscores that CIPA's pen register definition is properly interpreted as limited to devices that record destination information. As

explained above, before 2015, CIPA did not address pen registers at all, making it difficult for California law enforcement to use pen registers on an emergency basis without running afoul of federal law. *See supra* at 5-7. In 2015, the California Legislature enacted Assembly Bill No. 929 to close the gap by "[a]uthoriz[ing] state and local law enforcement agencies to seek an emergency order to use pen registers and trap and trace devices in telephone surveillance if there is probable cause to believe that their use will lead to evidence of a crime." Assem. Comm. on Privacy & Consumer Protection, Analysis of Assem. Bill No. 929, at 1 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 17, 2015).[6]

In enacting this provision, the California Legislature demonstrated its familiarity with the ordinary meaning of "pen registers" as tracking destination information. As explained in the Assembly Committee on Privacy and Consumer Protection's analysis of the bill, "[h]istorically, 'pen registers' are used to record *outgoing* numbers from a particular telephone line, while 'trap and trace' devices allow them to record the numbers that call in." *Id.* at 5 (emphasis added). Indeed, the legislative history could hardly be clearer on this point, repeatedly explaining that "a 'pen register' … allows law enforcement officers to record all *outgoing*

[6] The legislative history of Assembly Bill No. 929 is available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160AB929.

numbers from a particular telephone line." Assem. Comm. on Public Safety, Analysis of Assem. Bill No. 929, at 10 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 6, 2015) (emphasis added).[7]

Moreover, as the Assembly Committee on Public Safety observed, this understanding was shared by California law enforcement. An opinion from the California Attorney General, for example, explained that "[a] 'pen register' records the numbers *dialed out* from a particular telephone line." *Id.* at 11 (emphasis added) (quoting 86 Ops. Cal. Atty. Gen. 198 (2003)). The Los Angeles County District Attorney's Office likewise represented to the Committee its understanding that "[a] 'pen register' is an electronic device which records all numbers *called from (outgoing)* a particular telephone line." *Id.* at 16 (emphasis added). These legislative materials thus underscore what ordinary meaning makes clear: A pen register is a device that records outgoing, destination information. Software that records a website user's own IP address is not a pen register.

d. Since Section 638.51's enactment, several California trial courts have agreed with this understanding and rejected attempts to expand the statute to reach

---

[7] *See also, e.g.*, Sen. Comm. on Pub. Safety, Analysis of Assem. Bill No. 929, at 10 (Cal. Leg., 2015-16 Reg. Sess.) (June 15, 2015) (same description); Assem. Comm. on Appropriations, Analysis of Assem. Bill No. 929, at 1 (Cal. Leg., 2015-16 Reg. Sess.) (Apr. 28, 2015) (same description); Assem. Floor Analysis, Analysis of Assem. Bill No. 929, at 3 (Cal. Leg., 2015-16 Reg. Sess.) (July 8, 2015) (same description).

software that collects website users' own IP addresses. In *Palacios v. Fandom, Inc.*, for example, the court interpreted "pen register" in Section 638.51 as limited to devices that, like a traditional pen register, "collect the *destination* information of communications." No. 24STCV11264, 2024 WL 5494527, at *3 (Cal. Super. Ct. Sept. 24, 2024) (emphasis added). Software that collects an internet user's "own IP address"—which is the allegation here—"is not a pen register." *Id.* The court in *Rodriguez v. Plivo Inc.* likewise held that software that records a website visitor's "IP address is not the type of information collected by pen registers," which "collect outgoing information." No. 24STCV08972, 2024 WL 5184413, at *2 (Cal. Super. Ct. Oct. 2, 2024). And in *Aviles v. LiveRamp, Inc.*, the court held that "pen registers as defined by the statute … collect[] the outgoing addressing information from visitors' devices," a definition that excludes software that collects visitors' "own IP address[es]." No. 24STCV19869, 2025 WL 487196, at *2 (Cal. Super. Ct. Jan. 28, 2025).

These interpretations, issued by California courts interpreting California law, provide strong support for rejecting Plaintiffs' claim in this case. To be sure, this issue has not yet reached the California Supreme Court or, for that matter, the California Court of Appeal.[8] This Court therefore "must ascertain from all available

---

[8] The question whether Section 638.51 applies to software that collects IP addresses is currently pending in the California Courts of Appeal, Second and Sixth Districts, on petitions for writs of mandate. *See Variety Media, LLC v. Superior*

data" how the California appellate courts are likely to decide the issue. *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982). These state trial court decisions provide a key insight into how California judges understand and will apply Section 638.51(a).

e. Finally, interpreting Section 638.51(a)'s reference to "pen register[s]" as limited to devices that record destination information about where a communication is being sent properly "avoid[s] an interpretation that would lead to absurd consequences," *City of Los Angeles v. PricewaterhouseCoopers, LLP*, 553 P.3d 1194, 1205 (Cal. 2024) (citation omitted)—and potentially massive criminal liability.

The technology at issue in this case—cookies, pixels, and other software that collects basic online data like IP addresses of website visitors—is a ubiquitous part of the modern internet. Virtually every website on the internet uses this technology for analytics, functionality, advertising, or all of the above. And this technology was ubiquitous when Section 638.51 was enacted in 2015. *See, e.g.*, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 130-32 (3d Cir. 2015). Plaintiffs' belief that the California Legislature intended to radically restrict or outlaw this everyday technology through a statute about "pen registers"—without

---

*Court*, No. B350578 (Cal. Ct. App. filed Nov. 21, 2025); *Reuters News & Media Inc. v. Superior Court*, No. H053895 (Cal. Ct. App. filed Dec. 3, 2025).

even a whisper about it in the statute or legislative history—is absurd. The "[California] Legislature 'does not … hide elephants in mouseholes,'" *Mendoza v. Fonseca McElroy Grinding Co.*, 492 P.3d 993, 1005 (Cal. 2021) (citation omitted), and Plaintiffs are trying to fit an elephant about as big as they come. *Cf. Zellmer*, 104 F.4th at 1124 (applying ordinary meaning of defined term to "ensure that Meta is not forced to abandon key services that it offers its customers or risk perpetual liability").

The radical consequences of Plaintiffs' interpretation extend far beyond website analytics. Every computer connected to the internet records the IP addresses of the computers it is communicating with—and must collect those IP addresses so it can route communications back to those computers. *See Forrester*, 512 F.3d at 510 & n.5; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005). Thus, if any process for recording a device's IP address constitutes a "pen register," then every device on the internet is operating a pen register. That cannot be right. As one court put it, "because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet," applying a pen register statute to "prevent individuals who receive electronic communications from recording the IP information sent to them" would mean "the Internet could not function." *Capitol Recs. Inc. v. Thomas-Rasset*, No. 06-cv-1497, 2009 WL 1664468, at *3 (D. Minn. June 11, 2009).

Compounding the absurdity is that Plaintiffs' interpretation has criminal implications. Section 638.51 is housed in the Penal Code and provides for criminal penalties of up to one year of imprisonment and a $2,500 fine for every violation. Extending Section 638.51 beyond its intended scope would render this everyday technology a criminal offense, exposing countless website operators to criminal liability and staggering financial penalties. Thus, even if the statute could be read to warrant that absurd result, the rule of lenity—which requires "resolving any ambiguity in the ambit of the statute's coverage" in the defendant's favor—would counsel against it. *Harcott v. County of Kings*, 25 P.3d 649, 659 (Cal. 2001) (citation omitted); *cf. Van Buren v. United States*, 593 U.S. 374, 393 (2021) (rejecting interpretation that "would attach criminal penalties to a breathtaking amount of commonplace computer activity").

The more sensible interpretation is the one rooted in the ordinary understanding of a pen register, which is a device that records addressing information by which the user directs his communication to its destination. Under that definition, Plaintiffs fail to state a claim.

#### 2. Pen Registers Record Telephone Data, Not Online Data Like Plaintiffs' IP Addresses

Alternatively, even if this Court were to conclude that Section 638.51(a)'s reference to "pen register[s]" is not limited to devices that collect destination information, Plaintiffs' claim still fails for a more fundamental reason: CIPA's pen

register provision does not reach online data collection at all, as multiple California courts have held. Instead, that provision is properly limited to the telephonic context in which pen registers have traditionally operated. Thus, while the destination-only analysis set forth above fully resolves this case, the Court can also reject Plaintiffs' claim because it does not involve telephonic data in the first place.

The statutory structure and history support this interpretation. As noted above, a "pen register" is a well-settled term of art referring to a device that "records the numbers dialed on a telephone," *Smith*, 442 U.S. at 736 n.1 (citation omitted), and the California Legislature enacted Section 638.51 for the specific purpose of authorizing "state and local law enforcement agencies to seek an emergency order to use pen registers and trap and trace devices in *telephone surveillance*," Assem. Comm. on Privacy & Consumer Protection, *supra*, at 1 (emphasis added). Nowhere in the statute or its legislative history is there any mention of websites, IP addresses, or online data. Had the Legislature intended to extend CIPA—and its attendant criminal penalties—to the routine operation of commercial websites, one would expect it to have said so. The Legislature would not have buried that sweeping expansion in a statute using telephone-era references to "pen registers" that never once mentions the internet.

The cross-referenced compliance provisions in Section 638.51(a)—which permits the use of a pen register after "obtaining a court order pursuant to Section

638.52 or 638.53," Cal. Penal Code § 638.51(a)—further confirm this telephonic limitation. Section 638.52 requires that a court order authorizing a pen register "shall specify" the identity of the person associated with "the telephone line to which the pen register … is to be attached" and "[t]he number and, if known, physical location of the telephone line." *Id.* § 638.52(d)(1), (3). A magistrate cannot comply with these mandatory commands if the application does not involve a telephone line. Section 638.51's reference to these telephone-specific requirements confirms that the Legislature intended its pen register provision to apply only to telephonic technology. Indeed, these compliance provisions presuppose an entirely telephone-based regulatory framework that has no application to website analytics.

Finally, the Legislature's subsequent enactment of the California Consumer Privacy Act (CCPA) in 2018 eliminates any doubt. The CCPA expressly and comprehensively regulates the collection of "Internet Protocol address[es]" and "Internet or other electronic network activity information" by online businesses. Cal. Civ. Code § 1798.140(v)(1)(A), (F). It does so through a calibrated opt-out regime, not through criminal prohibition. And when the Legislature enacted this statute, it "is deemed to be aware of" the CIPA amendment enacted a few years prior. *People v. Scott*, 324 P.3d 827, 832 (Cal. 2014) (citation omitted). As a result, the statutes must be interpreted together so that they "may be harmonized and anomalies avoided." *Hohenshelt v. Superior Ct.*, 573 P.3d 944, 955 (Cal. 2025) (citation

omitted). Reading Section 638.51 to simultaneously criminalize the very same data collection that the CCPA expressly permits and regulates would bring the two statutes into irreconcilable conflict—a result the Legislature plainly did not intend.

A growing number of California trial courts have reached exactly this conclusion.[9] These decisions of California courts construing California law provide another helpful benchmark in assessing how the California appellate courts will decide this issue. Thus, whether the Court interprets Section 638.51 as limited to devices that record destination information or devices that record telephonic information, the result is the same: Software that merely collects a website user's own IP address is not a "pen register."

[9] *See, e.g.*, *Sanchez v. Cars.com Inc.*, No. 24STCV13201, 2025 WL 487194, at *3 (Cal. Super. Ct. Jan. 27, 2025) (holding that Section 638.51 "applies only to telephone-tracking technology, not IP address-collecting software"); *Scharon v. Paramount Glob.*, No. 25STCV10585, 2025 WL 2996812, at *1 (Cal. Super. Ct. Oct. 3, 2025) ("[S]ection 638.51 applies to telephone lines, not websites, because websites do not have lines, physical locations, or numbers."); *Rodriguez v. Ink Am. Int'l Grp. LLC*, No. 25STCV15350, 2025 WL 4034985, at *3-4 (Cal. Super. Ct. Dec. 10, 2025) ("CIPA's history and structure represents a telephonic limitation"); *Schallert v. Palo Alto Networks, Inc.*, No. 25STCV17109, 2026 WL 754028, at *2 (Cal. Super. Ct. Mar. 6, 2026) ("CIPA does not extend to website communications"); *Casillas v. Transitions Optical, Inc.*, No. 23STCV30742, 2024 WL 4873370, at *2 (Cal. Super. Ct. Sept. 9, 2024) (CIPA "does not address the privacy rights of internet users"); *Levings v. Open Text Corp.*, No. 24STCV05440, 2024 WL 5672082, at *2 (Cal. Super. Ct. Sept. 3, 2024) (same).

### B. The District Court's Expansive Interpretation Of Section 638.51 To Reach Website Users' IP Addresses Lacks Merit

The district court did not engage with the traditional understanding of a pen register or any of the California authorities applying that understanding in the context of CIPA. Instead, following in the footsteps of a few other federal district courts, the district court here focused on the individual words of the definition provision, Section 638.50(b), in isolation. According to the court, Section 638.50(b) extends to any "'process'" that collects "'addressing information,'" "'regardless of whether that addressing information pertains to the sender or the recipient of the communication,'" and so includes technologies that "collect" website visitors' own "IP addresses." ER-13 (citations omitted).

That interpretation defies the bedrock principle that "statutes are not read as a collection of isolated phrases." *United States v. Corrales-Vazquez*, 931 F.3d 944, 949 (9th Cir. 2019) (quoting *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009)); *accord Busker v. Wabtec Corp.*, 492 P.3d 963, 969 (Cal. 2021) ("[W]ords used in a statute are not considered in isolation."). Instead, the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

That interpretive principle carries particular force when, as here, a broad interpretation of the isolated words in a statutory definition would create "dissonance" between the definition and the term being defined. *Bond*, 572 U.S. at

861. Just as "chemical weapon" does not naturally sweep in every harmful use of a "toxic chemical," *id.* at 861-62, and "biometric identifier" does not naturally sweep in every "scan[] of face geometry," *Zellmer*, 104 F.4th at 1123-24, "pen register" does not naturally sweep in every process that captures an IP address. By reading the words "process" and "addressing" in the definition at the highest level of generality and ignoring that the words appear in a definition of "pen register," the district court employed a "sterile literalism [that] loses sight of the forest for the trees." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) (quoting *N.Y. Trust Co. v. Commissioner*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.), *aff'd*, 292 U.S. 455 (1934)).

The district court also tried to rescue Plaintiffs from the "dramatic" consequences of their interpretation, asserting that Plaintiffs are "concerned" not with "the routine receipt of an IP address for loading a website" but with "the *further* retention and transmission of their IP addresses" to third parties. ER-13. But the statute does not draw this distinction; indeed, it does not regulate the "further retention and transmission" of IP addresses at all. On Plaintiffs' view, CoStar violated the statute the moment it "captured … the[ir] IP addresses" upon visiting CoStar's websites. ER-58 (¶ 111). Applying Section 638.51 that broadly would undoubtedly "interrupt"—and criminalize—"basic internet function." ER-13. Thus, whatever "concerns" might have motivated Plaintiffs to bring this suit, "[i]t is

the *logical consequence*" of their theory "which provides a strong indication that something in [their] interpretation is amiss." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 632 (2012).

Finally, the district court pointed to CIPA's "consent-based exception" as a way out of those extreme consequences, asserting that "[b]y visiting [CoStar's] websites, Plaintiffs have clearly consented to disclosing their IP addresses for the purpose of loading the website, so CIPA would not apply." ER-13 (citing Cal. Penal Code § 638.51(b)(5)). That concession means Plaintiffs lose, because none of the other conduct mentioned by the district court—the "further retention," "transmission," and "use of IP addresses," *id.* (emphasis omitted)—is regulated by the statute. Plaintiffs do not allege otherwise. *See* ER-57–58 (¶¶ 108-16). The district court's reference to this provision simply reinforces the problem with Plaintiffs' claim.

Moreover, the consent exception cannot save Plaintiffs' interpretation from its absurd consequences. Many commonplace internet technologies involve the collection of IP addresses by third parties in situations where it is not even possible to obtain the user's consent beforehand. For example, a website may protect itself from DDoS attacks by routing all traffic through a vendor that screens out IP addresses associated with malicious botnets. Or a company may pass all incoming email through a vendor that blocks IP addresses associated with spam. Or an online

merchant may seek to prevent fraud by using a vendor to check whether purchasers' IP addresses are suspicious. None of these critical technologies can function without collecting IP addresses, and none can obtain user consent before doing so. Yet under Plaintiffs' interpretation, every one of them would constitute an illegal pen register, triggering criminal liability and even imprisonment. That is not the law.

All told, the district court's interpretation reflects an attempt to cure (or at least mitigate) a problem of its own creation. Had the court interpreted the definition of a pen register in line with the ordinary understanding of a pen register—a device that records destination information akin to a dialed telephone number—none of these manufactured distinctions would be necessary. That understanding, shared by California courts, the California Legislature, and California law enforcement, reflects the best reading of the statute. The district court's failure to apply that reading should be reversed, and Plaintiffs' claim should be dismissed.

## CONCLUSION

This Court should reverse the district court's denial of CoStar's motion to dismiss.

Dated: May 28, 2026

Respectfully submitted,

*s/ Michael H. Rubin*

Michael H. Rubin
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 395-0600
michael.rubin@lw.com

Alexander C.K. Wyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 400
Los Angeles, CA 90071
(213) 485-1234

Roman Martinez
Nicholas J. Boyle
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Defendant-Appellant CoStar Group, Inc.*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant CoStar Group, Inc. states that it is unaware of any related cases currently pending in this Court.

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-1652

I am the attorney or self-represented party.

This brief contains 13,372 words, including words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Michael H. Rubin **Date** May 28, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# ADDENDUM

Pursuant to Ninth Circuit Rule 28-2.7

# TABLE OF CONTENTS

**Page**

U.S. Const. art. III, §§ 1-2 .......... Add. 1

Cal. Penal Code § 637.2 .......... Add. 2

Cal. Penal Code § 638.50 .......... Add. 3

Cal. Penal Code § 638.51 .......... Add. 4

Cal. Penal Code § 638.52 .......... Add. 5

Cal. Penal Code § 638.53 .......... Add. 9

## U.S. Const. art. III, §§ 1-2

**Article III.**

**Section 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

**Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;— between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

* * *

## Cal. Penal Code § 637.2

### § 637.2. Civil action by person injured; injunction

(a) Any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts:

(1) Five thousand dollars ($5,000) per violation.

(2) Three times the amount of actual damages, if any, sustained by the plaintiff.

(b) Any person may, in accordance with Chapter 3 (commencing with Section 525) of Title 7 of Part 2 of the Code of Civil Procedure, bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a).

(c) It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages.

(d) This section shall not be construed to affect Title 4 (commencing with Section 3425.1) of Part 1 of Division 4 of the Civil Code.

## Cal. Penal Code § 638.50

### § 638.50. Definitions

For purposes of this chapter, the following terms have the following meanings:

(a) "Wire communication" and "electronic communication" have the meanings set forth in subdivision (a) of Section 629.51.

(b) "Pen register" means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. "Pen register" does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business.

(c) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.

(d) "Prohibited violation" has the same meaning as that term is defined in Section 629.51.

## Cal. Penal Code § 638.51

### § 638.51. Use of pen register or trap and trace device

(a) Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53.

(b) A provider of electronic or wire communication service may use a pen register or a trap and trace device for any of the following purposes:

(1) To operate, maintain, and test a wire or electronic communication service.

(2) To protect the rights or property of the provider.

(3) To protect users of the service from abuse of service or unlawful use of service.

(4) To record the fact that a wire or electronic communication was initiated or completed to protect the provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful, or abusive use of service.

(5) If the consent of the user of that service has been obtained.

(c) A violation of this section is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(d) A good faith reliance on an order issued pursuant to Section 638.52, or an authorization made pursuant to Section 638.53, is a complete defense to a civil or criminal action brought under this section or under this chapter.

## Cal. Penal Code § 638.52

### § 638.52. Application and authorization of use of pen register or trap and trace device by peace officer

(a) A peace officer may make an application to a magistrate for an order or an extension of an order authorizing or approving the installation and use of a pen register or a trap and trace device. The application shall be in writing under oath or equivalent affirmation, and shall include the identity of the peace officer making the application and the identity of the law enforcement agency conducting the investigation. The applicant shall certify that the information likely to be obtained is relevant to an ongoing criminal investigation and shall include a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates.

(b) The magistrate shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device if the magistrate finds that the information likely to be obtained by the installation and use of a pen register or a trap and trace device is relevant to an ongoing investigation and that there is probable cause to believe that the pen register or trap and trace device will lead to any of the following:

(1) Recovery of stolen or embezzled property.

(2) Property or things used as the means of committing a felony.

(3) Property or things in the possession of a person with the intent to use them as a means of committing a public offense, or in the possession of another to whom they may have delivered them for the purpose of concealing them or preventing them from being discovered.

(4) Evidence that tends to show a felony has been committed, or tends to show that a particular person has committed or is committing a felony.

(5) Evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under 18 years of age, in violation of Section 311.11, has occurred or is occurring.

(6) The location of a person who is unlawfully restrained or reasonably believed to be a witness in a criminal investigation or for whose arrest there is probable cause.

(7) Evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code.

(8) Evidence that does any of the following:

(A) Tends to show that a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, has been committed or is being committed.

(B) Tends to show that a particular person has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code.

(C) Will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code.

(c) Information acquired solely pursuant to the authority for a pen register or a trap and trace device shall not include any information that may disclose the physical location of the subscriber, except to the extent that the location may be determined from the telephone number. Upon the request of the person seeking the pen register or trap and trace device, the magistrate may seal portions of the application pursuant to People v. Hobbs (1994) 7 Cal.4th 948, and Sections 1040, 1041, and 1042 of the Evidence Code.

(d) An order issued pursuant to subdivision (b) shall specify all of the following:

(1) The identity, if known, of the person to whom is leased or in whose name is listed the telephone line to which the pen register or trap and trace device is to be attached.

(2) The identity, if known, of the person who is the subject of the criminal investigation.

(3) The number and, if known, physical location of the telephone line to which the pen register or trap and trace device is to be attached and, in the case of a trap and trace device, the geographic limits of the trap and trace order.

(4) A statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates.

(5) The order shall direct, if the applicant has requested, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device.

(e) An order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed 60 days.

(f) Extensions of the original order may be granted upon a new application for an order under subdivisions (a) and (b) if the officer shows that there is a continued probable cause that the information or items sought under this subdivision are likely to be obtained under the extension. The period of an extension shall not exceed 60 days.

(g) An order or extension order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that the order be sealed until the order, including any extensions, expires, and that the person owning or leasing the line to which the pen register or trap and trace device is attached not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber or to any other person.

(h) Upon the presentation of an order, entered under subdivisions (b) or (f), by a peace officer authorized to install and use a pen register, a provider of wire or electronic communication service, landlord, custodian, or other person shall immediately provide the peace officer all information, facilities, and technical assistance necessary to accomplish the installation of the pen register unobtrusively and with a minimum of interference with the services provided to the party with respect to whom the installation and use is to take place, if the assistance is directed by the order.

(i) Upon the request of a peace officer authorized to receive the results of a trap and trace device, a provider of a wire or electronic communication service, landlord, custodian, or other person shall immediately install the device on the appropriate line and provide the peace officer all information, facilities, and technical assistance, including installation and operation of the device unobtrusively and with a minimum of interference with the services provided to the party with respect to whom the installation and use is to take place, if the installation and assistance is directed by the order.

(j) A provider of a wire or electronic communication service, landlord, custodian, or other person who provides facilities or technical assistance pursuant to this section shall be reasonably compensated by the requesting peace officer's law enforcement

agency for the reasonable expenses incurred in providing the facilities and assistance.

(k) Unless otherwise ordered by the magistrate, the results of the pen register or trap and trace device shall be provided to the peace officer at reasonable intervals during regular business hours for the duration of the order.

(*l*) The magistrate, before issuing the order pursuant to subdivision (b), may examine on oath the person seeking the pen register or the trap and trace device, and any witnesses the person may produce, and shall take their affidavit or their affidavits in writing, and cause the affidavit or affidavits to be subscribed by the parties making them.

(m) Notwithstanding any other provision in this section, no magistrate shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device for the purpose of investigating or recovering evidence of a prohibited violation, as defined in Section 629.51.

## Cal. Penal Code § 638.53

### § 638.53. Oral approval for installation and use of pen register or trap and trace device by peace officer

(a) Except as otherwise provided in this chapter, upon an oral application by a peace officer, a magistrate may grant oral approval for the installation and use of a pen register or a trap and trace device, without an order, if he or she determines all of the following:

> (1) There are grounds upon which an order could be issued under Section 638.52.
>
> (2) There is probable cause to believe that an emergency situation exists with respect to the investigation of a crime.
>
> (3) There is probable cause to believe that a substantial danger to life or limb exists justifying the authorization for immediate installation and use of a pen register or a trap and trace device before an order authorizing the installation and use can, with due diligence, be submitted and acted upon.

(b)(1) By midnight of the second full court day after the pen register or trap and trace device is installed, a written application pursuant to Section 638.52 shall be submitted by the peace officer who made the oral application to the magistrate who orally approved the installation and use of a pen register or trap and trace device. If an order is issued pursuant to Section 638.52, the order shall also recite the time of the oral approval under subdivision (a) and shall be retroactive to the time of the original oral approval.

(2) In the absence of an authorizing order pursuant to paragraph (1), the use shall immediately terminate when the information sought is obtained, when the application for the order is denied, or by midnight of the second full court day after the pen register or trap and trace device is installed, whichever is earlier.

(c) A provider of a wire or electronic communication service, landlord, custodian, or other person who provides facilities or technical assistance pursuant to this section shall be reasonably compensated by the requesting peace officer's law enforcement agency for the reasonable expenses incurred in providing the facilities and assistance.